I. Richard Levy
State Bar No. 12265020
Christopher M. McNeill
State Bar No. 24032852
Susan Frierott
State Bar No. 24041247
**BLOCK & GARDEN, LLP**
5949 Sherry Ln., Suite 900
Dallas, Texas 75225
Tel: (214) 866-0990
Fax: (214) 866-0991
*levy@bgvllp.com*

APPLICANTS FOR COUNSEL TO LEVELLAND/HOCKLEY COUNTY ETHANOL, L.L.C., DEBTOR IN POSSESSION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE § § | | |
| **LEVELLAND/HOCKLEY COUNTY ETHANOL, LLC** § § § | CASE NO. 11-50162-11 | |
| § | CHAPTER 11 | |
| DEBTOR § § | | |

## EXPEDITED MOTION OF THE DEBTOR UNDER 11 U.S.C. §§105, 363 AND 364 TO APPROVE ENTRY INTO ASSET MANAGEMENT AGREEMENT WITH TENASKA BIOFUELS, LLC AND FOR RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Levelland/Hockley County Ethanol, LLC ("Levelland Ethanol" or the "Debtor"), debtor and debtor in possession in the above-referenced chapter 11 case, by and through its undersigned counsel, files this *Expedited Motion Of The Debtor Under 11 U.S.C. §§363 and 364 To Approve Entry Into Asset Management Agreement With Tenaska BioFuels, LLC and For Related Relief* (the "Motion"). In support of this Motion, Debtor respectfully shows as follows:

## SUMMARY

1. Resuming full operation of its ethanol plant is the single, most critical step to a successful reorganization for the Debtor. The Debtor cannot find "conventional" post-petition financing sufficient to operate the plant. Even if available, a post-petition lender hefty fees and a first priority, super-priority or senior lien in all assets, to which Debtor's lenders, GE Energy Financial Services, as agent, and Farmers Energy Levelland, LLC ("FEL") would most seriously object.

2. Instead, the Debtor has negotiated a "tolling" arrangement with Tenaska BioFuels, LLC ("Tenaska"), a subsidiary of Tenaska Energy, to have it supply grain, natural gas and denaturant to the Debtor to process into ethanol and distilled grains which Tenaska will market. Tenaska retains title to the inputs and outputs in the arrangement, and in return, the Debtor receives the net sales as processing fees less a fee to Tenaska of 2.5 percent and 3.5 percent on ethanol sales. The net effect is equal to approximately $10 million of post-petition working capital without an adverse effect on the secured lenders collateral.

3. The Debtor believes that the implementation of the Tenaska Agreement is essential to demonstrate its operational capacity and, in turn, to realize to the fullest extent the value of its assets. Based on all information available to its board of managers, the Debtor's ethanol plant *in production* is worth at least 25% more than it is *not in production*. While operating, the Debtor expects to propose a plan of reorganization that will repay all creditors and retain some value for its members that may be funded by new investment, a market purchaser or even through its operations alone.

4.  Timing is critical to implement the Tenaska Agreement. The plant needs to have grain supplies to test its equipment to insure that the operational shut-down effected in December of last year has not damaged or limited its production capability. If repairs or adaptations are needed, they must be completed promptly to take advantage of the prime profitable months which begin around September and coincide with the harvest period of its main input – grain sorghum (milo) or corn. The sale of ethanol at market price is one key to profitability. The other major factor to profitability is the disposition of distilled grain products ("DDG's") at market prices. DDG's must be sold as protein rich feed supplements to cattle feedlots, dairies and other ranching uses in the area—the same parties to whom the Debtor was unable to reliably deliver DDG's in the past. Tenaska's credit and reputation can reestablish these relationships, but it will take a few months. Thus, failing to start the process immediately will lead to set backs and delays later when the dollars count the most. The Debtor urges the Court and parties in interest to join it in support of the Tenaska Agreement on an expedited basis.

## JURISDICTION

5.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157(b) and 1334 and 11 U.S.C. §§105(a), 361, 363(b) and (c), and 364. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (D), (M) and (O). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

6.  The Debtor filed its voluntary petition under chapter 11 on April 27, 2011 (the "Petition Date"). Pursuant to 11 U.S.C. §§1107(a) and 1108, Debtor now operates

**EXPEDITED MOTION OF THE DEBTOR UNDER 11 U.S.C. §§105, 363 AND 364 TO APPROVE ENTRY INTO ASSET MANAGEMENT WITH TENASKA BIOFUELS, LLC AND RELATED RELIEF --PAGE 3 OF 16**
15MotApproveTenaskaAgreement

its business and manages its properties as a debtor in possession. The Court has designated the case as a complex chapter 11 case under the Local Bankruptcy Rules. The U.S. Trustee has formed an official creditors' committee as of Monday, May 9, 2011, the appointment of which is expected to be finalized in the next few days. The Debtor expects to meet with the Committee in the near future to discuss this Motion among other matters.

*Brief Description of the Debtor's Business*

7. Levelland Ethanol is a Texas limited liability company that owns and operates an ethanol production plant located in Levelland, Hockley County, Texas. The plant is rated to produce 40 millions gallons of ethanol a year (also called its "nameplate"), and at full capacity may produce slightly above nameplate. The plant is located on a 223-acre site in Hockley County, just five miles east of the city limits of Levelland and about 25 miles west of Lubbock. The Debtor's staff presently numbers 24 employees, nearly all of whom live within 10 miles of the plant. When in full production, the Debtor's staff is expected to nearly double that number. Levelland Ethanol has approximately 135 local members including many local farmers, business people and civic leaders.

8. An extensive appraisal of the Debtor's facility completed on January 27, 2011, values the Debtor's assets with the plant under full operation at over $51.5 million. The same appraisal sets a non-operating value at $40 million. The Debtor's senior secured bank group, represented by GE Energy Financial Services, is owed approximately $33,320,000 in principal and accrued interest as of the petition date. Principal and interest of $9,040,000 is due to the subordinated secured lender, Farmers

Energy Levelland, LLC ("FEL").[1] The Debtor's unsecured and other obligations, based on its books and records and estimates, are approximately $4,683,000 as of the Petition Date.

*Tenaska BioFuels, LLC*

9. Tenaska BioFuels, LLC ("TBF") has reached an agreement with the Debtor under the terms of which the Debtor will be able to operate the ethanol plant without the need for conventional post-petition financing.[2] The terms of the arrangement are incorporated in the Asset Management and Post-Petition Financing Agreement (the "Tenaska Agreement")[3] which are summarized in detail below.

10. TBF is an affiliate of Tenaska Energy, a major national energy company which develops, constructs, owns and operates non-utility electric generation and cogeneration plants. Tenaska also markets natural gas, electric power and biofuels, and provides risk management services for biofuel and energy customers. Headquartered in Omaha, Nebraska, Tenaska Energy is ranked as one the 25 largest privately held companies in the U.S.

---

[1] FEL, an affiliate of Rex American companies, is also the single largest equity holder in the Debtor, holding member interests of 48.6%.

[2] The form of this style arrangement is often referred to as a "tolling" agreement because the supplier, here Tenaska, charges a percentage of revenues—or "toll"—and the remainder is paid to the producer –here the Debtor--for processing the goods owned by the supplier. Title to the inputs and outputs remain with Tenaska and would not be subject to liens of Debtor's creditors.

[3] The Tenaska Agreement is *not* attached as an exhibit due to the its confidentiality provisions that limit disclosure due to the inclusion of Tenaska's proprietary information and terms. Tenaska maintains, and the Debtor agrees, that the Tenaska Agreement contains the business and proprietary information of Tenaska constituting trade secrets and/or confidential commercial information that require protection from general disclosure. The Tenaska Agreement is subject to a Motion to Seal Under Fed. R. Bankr. P. 9018 filed contemporaneously herewith. The Debtor and Tenaska have arranged for the unsecured creditors' committee and the secured lenders, and their counsel, to have access to the Tenaska Agreement subject to a confidentiality agreement.

11.     TBF's business is to provide marketing, physical delivery and financial services to customers in the ethanol and biodiesel industries in the Midwest and nationwide.  TBF has developed productive relationships with alternative fuels producers, marketers, blenders and retailers and has entered into agreements with several industry participants to sell 100% of their ethanol production.  TBF has been involved in several other arrangements of this type with ethanol plants which were either in bankruptcy or were in need of working capital to operate.

*Description of the Tenaska Agreement*

12.     Under the Tenaska Agreement, TBF will purchase the milo (sorghum) and denaturant and natural gas ("supplies") for its own account and will own and market the ethanol and DDG's that are produced at the plant.  The Debtor will provide labor, other chemical inputs, facilities and processing services to Tenaska for the production of the ethanol.  TBF will be paid a percentage fee (between 2.5 and 3.5% of ethanol sales) for purchasing inputs, risk management services and marketing the ethanol and DDG's produced.  The Debtor will receive the net sales proceeds as a processing fee on a weekly/ monthly basis.  TBF retains the ownership and title to its inputs and to the outputs.  In order to ensure profitability, the Debtor has the right to approve the various contracts and the prices at which Tenaska will purchase grain and supplies and at which it will sell the ethanol and DDG's.  The terms of the Tenaska Agreement are at "industry standard" or are more favorable to the Debtor.

13. The Tenaska Agreement's major terms include:

(a) The Agreement is effective only upon the entry of an approval order by the Bankruptcy Court with an initial term ending on December 31, 2014; subject to the Debtor's option to early termination (*see below*);

(b) The debtor controls decisions on whether Tenaska will purchase grain and other inputs if a "Minimum Crush Margin" exists;

(c) Tenaska will exercise its hedging, risk management and buying power for the benefit of the Debtor to obtain grain supplies to ensure full plant production, and to procure natural gas and denaturants. The Debtor is required to bear certain processing costs, natural gas transportation and costs of labor;

(d) Title to the grain, supplies and products remains in Tenaska as a "bailment", but the Debtor must insure against risk of loss during processing.[4]

(e) The Debtor's processing must meet certain minimum levels as to amount and quality, assuming full quality grain supplies;

(f) Sales of the DDG's will be a cooperative effort with Tenaska's guaranty of purchasers' contracts as long as they qualify for credit;

(g) Tenaska must use its best efforts to sell the ethanol at the highest possible price;

(h) The Debtor must not purchase grain or other supplies upon the effective date to ensure that Tenaska's title is not affected;

(i) Payments to the Debtor are calculated by formula which provides for costs of grain, supplies and certain hedging costs to be deducted from the total proceeds with the remainder paid to the Debtor less Tenaska's "toll" fee that cannot exceed 3.5%. The fee is to be paid each week in an amount of at least 80% of expected amounts, with the remainder due by the 15th of the following month for prior month;

(j) Tenaska withholds $50,000 a month from processing fees for the first 5 months as a deposit against possible "wind-down" costs;

---

[4] The Debtor already has active insurance policies in place covering all (or the vast majority) matters set forth in the Tenaska Agreement.

(k)  Hedging costs should be minimized to balance transactions and must be agreed to by the Debtor;

(l)  Defaults include: (i) Tenaska's failure to make timely payments or buy inputs at the instruction of the Debtor if the "crush margin" dictates; (ii) any party's breach of representations or warranties or failure to timely perform; and (iii) the Debtor's failure to process in the quality or quantity, and certain negative bankruptcy events including the appointment of a trustee, conversion to a chapter 7;

(m)  Remedies on default include suspension of performance and termination of the agreement;

(n)  If the Debtor gives notice of termination or another termination event occurs, then a wind-down period goes into effect. If Tenaska suffers additional costs in excess of the wind-down deposit (see above), it may reserve additional sums from future payments; and

(o)  The Debtor has the exclusive right to terminate the Agreement upon 90 days written notice to Tenaska and the payment of a "Termination Fee." The Termination Fee is calculated on a formula based on the remaining term, but it cannot exceed $360,000 if termination occurs due to notice given by the Debtor effective after 180 days from the effective date. Also, the Termination Fee may be due on other types of termination of the agreement.

## RELIEF REQUESTED

14.  By this Motion, Debtor seeks authority to enter into and perform under the Tenaska Agreement under the provisions of 11 U.S.C. §363(b)(1) as a use of the Debtor's property outside the ordinary course of business. Although the Debtor's business is the processing of grain into ethanol, the terms of the Tenaska Agreement do call for Court approval prior to its effectiveness.

15.  Further, the Debtor seeks an order under 11 U.S.C. §§105, 363 and 364 that recognizes Tenaska's title to the supplies and products under the Agreement as bailments and recognizing Tenaska's superior title to the same *vis a vis* any other stakeholder, including secured creditors or taxing authorities. The §364(b) relief

requested is very limited, because entry into this arrangement will negate the need for post-petition financing of the traditional sort, and does not contemplate any need for the existing lenders to have their collateral surcharged or their liens primed. Instead it seeks only the treatment of any amounts due under the Tenaska Agreement to have administrative claim priority under 11 U.S.C. §501(b)(1).

16. To the extent not consented to by the secured lenders, the Debtor also seeks the authorization of the use of cash collateral under 11 U.S.C. § 363(b)(2) to provide for payment of the limited operating expenses, natural gas transportation and labor costs in the Debtor's column to perform under the Tenaska Agreement.

17. The Debtor requests that this Motion be considered on an expedited basis due to the immediate need to prepare the plant for operations and to commence operations before September, as well as to ensure no further cash drain from shut-in operations and possible deterioration in the plant.

**ARGUMENT AND AUTHORITIES**

18. Debtor does not have sufficient available sources of working capital and financing to operate its business, including post-petition purchases of grain, supplies or other inventory, even with unfettered use of cash collateral. In fact, the Debtor estimates that sufficient working capital to operate the plant at or near capacity could require financing of $10 million or more. In addition, Debtor's need for financing is immediate and critical, with maintenance and enhancement of the going concern value of Debtor of the utmost significance to the development and proposal of a plan of reorganization and a successful conclusion of Debtor's chapter 11 case.

19. Over the first months of this year, the Debtor has engaged in an extensive search for alternative funding sources and possible sales of the plant, and in serious negotiations with GE in order to pursue a restructuring plan of its debt. The Debtor has explored numerous possibilities to refinance, obtain new equity or otherwise find working capital for its operations. Prior to the Petition Date, the Debtor was unable to find adequate sources of working capital or to propose an acceptable restructuring plan to GE.

20. The Debtor also had contact with a number of industry entities about possible "tolling" arrangements as an alternative to working capital loans. The Debtor believes that the Tenaska Agreement is its best alternative to return to operation and the Tenaska Agreement terms the best that the Debtor could obtain.

21. The Tenaska Agreement provides what is essentially a "no-collateral" solution to obtain sufficient working capital to operate the plant. The Tenaska Agreement provides the means for the Debtor to operate at full capacity while not having to borrow funds to purchase grain nor be committed to any long term contracts to sell ethanol or its distiller grains. Essentially, the Debtor performs processing as a service on the Tenaska owned sorghum (milo) and hands back the distilled and remaining products. Thus, the Debtor receives a substantial income riding on the coattails and reputation of Tenaska—from its ability to negotiate better prices for inputs and sale of output, to its access to hedging and risk management to its long term futures to assure price stability and its best chance chance at a return to profitability. Further, even with a DIP line of credit, the Debtor may not have the negotiation power

and level of trust with former vendors that that Tenaska will bring to the table with the Tenaska Agreement.

22. The appraised value of the Debtor's facility and assets in operation is 25% more than the value of the plant sitting unproductively. That is the entire difference between payment in full of all creditors and payment in full of only GE. The operation of the Plant on a capacity basis for some number of months in a row is necessary to demonstrate:

- That the valuation of the Plant should be on a going concern basis, not a shut-in basis;
- to attract equity investment, sale opportunities, or even a self-funded plan that recognizes the greater operational value of the plant assets;
- as a result, a reorganization plan could provide for payment not only of the secured obligations but also of all of the unsecured and other obligations of the debtor estimated not to exceed $4.6 million and if possible, retain some value for membership interests under the confirmation rules of 11 U.S.C. §1129(b).

23. With an operating plant, solid evidence suggests that the Debtor will be able to attract new investment in the Plant in addition to the option to recapitalize on its own. For example, new equity investment would allow the earlier retirement of the Debtor's secured, subordinated and unsecured indebtedness. The Debtor expects to be able to propose a plan of reorganization with a few months after operations resume under the Tenaska Agreement. The Debtor's operating projections through the end of the year (developed as an exhibit to its Motion to use Cash Collateral) illustrating the effect of the Tenaska Agreement are attached hereto as **Exhibit "A."**

24. The Tenaska Agreement would benefit all creditors interests, including its secured lenders. The Tenaska Agreement does not affect the collateral of the secured

lenders negatively. GE and FEL are protected from diminution of the value of the Plant, and their collateral is enhanced by the ability of the Debtor to operate. Neither would have to give up any of their present collateral (except for the use of cash collateral which would be protected by replenishment of cash used by proceeds of processing fees and the additional value that accrues to the Plant by placing it in operation). Further, upon information and belief, the impact of the Tenaska Agreement would have a positive effect on the ability of the secured creditors to realize more on their secured debt than if the plant was non-operational.

25. Debtor is at a difficult crossroads. It has sufficient cash only to operate as a skeleton for a number of months and hope for a miracle *or* to implement the Tenaska Agreement and perhaps blaze a new future. The Debtor's board of managers, in the proper exercise of business judgment, has chosen the second course.

26. The secured claims of the GE lender group and of FEL are protected by recognized increase in the value of the plant if operating. Further, cash collateral usage is protected by the existing equity cushion in the value of the plant against the total GE debt and in the replacement of cash used by the proceeds of production payments. The Debtor projects will replenish the Debtor's cash to the petition date level within two months of operations under the Tenaska Agreement. *See* Exhibit "A." *See In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987) (replacement lien in expected proceeds, even with some risk, is sufficient adequate protection at early stages in a chapter 11).

27. Given Debtor's current financial condition, financing arrangements and capital structure, Debtor is unable to obtain unsecured credit allowable under 11 U.S.C.

§503(b)(1) as an administrative expense. Financing on a post-petition basis is not otherwise available even were the Debtor to grant priming or super-priority liens and/or administrative expenses under §364(c)(1).

28. The Tenaska Agreement will provide the Debtor with control over its own destiny. Tenaska's credit and reputation will allow the Debtor to obtain the best price for grain and other inputs (natural gas and denaturant) on a long term hedged basis. It will further allow for the Debtor to compare long term (60, 90 even 120 day) contracts for ethanol delivery against the prices of inputs for the same period. The "Crush Margin" calculations will allow the Debtor to decide if it can produce profitably several months in advance and then with the relative luxury of consistent supply of grain and markets to its products with risk managed pricing.

29. The Tenaska Agreement will assist the Debtor in limiting the lows and the highs on both prices and profits--the Debtor seeking consistent and sustained operations at pre-determined profitable levels instead. Once production can be assured, the Debtor firmly believes, it will be able to market itself more effectively to suitors to provide new equity, assume or pay portions of the secured debt, sell the plant at the best price or restructure the indebtedness in whole. In the meantime the Debtor expects to build up substantial cash from operations that will protect the interest of the secured creditors, pay interest current when and if allowed, and aid in funding a plan of reorganization proposed in a reasonable period of time.

30. While operation of the Debtor's plant would not normally be "outside the ordinary course," the post-petition agreement with Tenaska is likely subject to §363(b) review and approval upon notice and hearing. Under those circumstances, the debtor

in possession is authorized to use property of the estate outside the ordinary course of business under §363(b) if it can demonstrate a justifiable business purpose to the transaction. *See, e.g., In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (under *Lionel* and its progeny, the standard for use outside the ordinary course of business is an articulated and sound business purpose). Under these circumstances, there is a sound business justification for this use of the Debtor's assets.

31. Further, the Debtor believes the Tenaska Agreement enhances its reorganization possibilities. While proof that the transaction will result in a successful reorganization is not the standard applied to §363(b) decisions, the Debtor submits that entry into and proceeding under the Tenaska Agreement **will be** a substantial enhancement to the debtor's reorganization prospects. *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999) (the *Lionel* court did not require debtors to establish the more stringent proof that a proposed transaction is connected to a reasonable prospect of successful reorganization—rather only a showing that a use, sale or lease under §363(b) "will aid the debtor's reorganization.").

32. In point of fact, while the termination fee under the Tenaska Agreement does act as some barrier to entry, it is not unusual for a termination fee to be charged in post-petition financing arrangements accompanied with many more draconian terms and fees, often at the expense of pre-petition lenders collateral by imposition of priming liens and the like. *See, e.g. In re Western Pacific Airlines, Inc.*, 223 B.R. 567, 572-573 (Bankr. D. Col. 1997) (post-petition financing arrangement was approved with terms including ceding certain operations and ownership of assets to lender and granting super-priority liens and other protections). The termination fee included in the Tenaska

Agreement is reasonable given the moneys Tenaska will commit and the risks it undertakes over the first 6 month period of the Agreement and as reasonable compensation if a reorganization plan is proposed which is financed by a party(ies) who may not wish to continue the arrangement. Courts have approved termination fees in post-petition financing agreements which become due upon implementing alternative funding for a reorganization. *See Id.* at 570.; *see also In re Qimonda Richmond, LLC*, 2009 WL 7742526, *5 (Bankr. D. Del. 2009).

## EXPEDITED HEARING REQUESTED

33. Timing is critical. The reason for the Debtor's choice to file its voluntary chapter 11 case now rather than later in the summer or at some other time involves two critical facts. First, its cash reserves that total approximately $1.3 million on the petition date are insufficient to implement any operations without the Tenaska arrangement. The second reason for immediate timing is that the Plant must be up and running to take advantage of the September crop harvest, which is historically the key profit period. If the approval of the Tenaska Agreement is delayed, unknown problems returning the plant to full operations from the December 2010 shut-down state and possible repairs could side-line the plant for a few weeks. The necessary time to fix, adjust or improve to go operational could extend outside the harvest timeline. A prudent operator needs four months to ensure that operations are running smoothly and that should a major problem arise, that the problem could be cured promptly. As a result, the Debtor is in need of expedited consideration of the approval of the Tenaska Agreement.

## CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court:

(i) Enter an Order under 11 U.S.C. §§105(a), 363(b) and 364 approving the Debtor's execution, entry into and the performance of the Tenaska Agreement;

(ii) provide for the use of cash collateral and adequate protection of such use as requested herein under 11 U.S.C. §363 and 361;

(iii) recognize the title of Tenaska to the supplies and products under the Tenaska Agreement's terms; and

(iv) for such other and further relief as this Court shall deem just and proper.

Dated: May 10, 2011.                    Respectfully submitted,

**BLOCK & GARDEN, LLP**

   /s/ Richard Levy
I. Richard Levy
State Bar No. 12260520
Christopher M. McNeill
State Bar No. 24032852
Susan Frierott
State Bar No. 24041247
5949 Sherry Ln., Suite 900
Dallas, Texas 75225
Tel: (214) 866-0990
Fax: (214) 866-0991
*levy@bgvllp.com*

## CERTIFICATE OF SERVICE

I certify that on May 10, 2011, a copy of the foregoing Motion was served via ECF notice upon the parties filing a notice of appearance in the case, upon the shortened service list prescribed in the Complex Chapter 11 Procedures and detailed in the separately filed certificate of service of a number of pleadings and matters filed this day and upon the United States Debtor's Office by e-mail and facsimile.

   /s/ I. Richard Levy
I. Richard Levy

# EXHIBIT "A"

**Levelland Hockley County Ethanol, LLC**  Updated: 04/27/11
Monthly Cash Basis Profit and Loss / Cash Flow Projection

| File: Workout Model Ver 11<br>(000)'s Omitted (except gallons produced) | June 2011 | July 2011 | August 2011 | September 2011 | October 2011 | November 2011 | Year 1<br>December 2011 |
|---|---|---|---|---|---|---|---|
| Memo: Gallons Produced | 3,085,714 | 3,364,000 | 3,455,714 | 3,180,000 | 3,540,000 | 3,480,000 | 3,540,000 |
| | | | | | | | |
| Total Ethanol Sales | 8,208 | 8,948 | 9,192 | 8,459 | 9,416 | 9,257 | 9,416 |
| Total Distillers Grain Sales | 2,178 | 2,332 | 2,389 | 2,194 | 2,184 | 2,114 | 2,150 |
| Less: Tenaska Provided Grain,Gas, Denaturant | (8,861) | (9,494) | (9,752) | (8,974) | (9,659) | (9,340) | (9,502) |
| Less: Tenaska Fee | (246) | (313) | (322) | (296) | (330) | (324) | (330) |
| Amount Due LHCE | 1,278 | 1,473 | 1,508 | 1,383 | 1,612 | 1,706 | 1,735 |
| | | | | | | | |
| Net Tenaska Revenue Received | 1,250 | 1,028 | 1,723 | 1,258 | 1,383 | 1,862 | 1,456 |
| | | | | | | | |
| COGS Not Included Above | | | | | | | |
| Chemicals | 289 | 315 | 323 | 297 | 331 | 326 | 331 |
| Shop Labor Costs | 117 | 118 | 119 | 117 | 119 | 119 | 119 |
| Taxes and Fringe on Labor Costs  20% | 23 | 24 | 24 | 23 | 24 | 24 | 24 |
| Electricity Costs | 143 | 148 | 150 | 145 | 152 | 150 | 152 |
| Gas Transportation (CEI, Fowler & MarkWes | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| Water Treatment (Layne Lease & Usage) | 40 | 41 | 41 | 40 | 41 | 41 | 41 |
| Solid Waste | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Facility and Equipment Leases | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Property Taxes | | | | | | | |
| Insurance | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Repairs and Maintenance | 96 | 96 | 96 | 96 | 400 | 96 | 96 |
| Plant Safety and Supplies | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| Plant Vehicle Expenses | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Other Cost of Sales | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| Feed Taxes | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Total Cost of Goods Sold Not Paid by Tena | 825 | 858 | 869 | 836 | 1,183 | 871 | 879 |
| Gross Margin | 425 | 171 | 854 | 422 | 200 | 991 | 577 |
| | | | | | | | |
| General and Administrative Expenses | 85 | 104 | 85 | 85 | 104 | 85 | 85 |
| Net Cash Generated from Operations | 341 | 66 | 770 | 337 | 96 | 906 | 493 |
| | | | | | | | |
| Less: Debt Service Payments and Deposits Held | | | | | | | |
| GE Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GE Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rex Principal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rex Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unsecured Creditors | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Debt Service Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Cash Flow after Debt Service Payments | 341 | 66 | 770 | 337 | 96 | 906 | 493 |
| | | | | | | | |
| Beginning Available Cash | 903 | 1,244 | 1,310 | 2,079 | 2,417 | 2,512 | 3,419 |
| Ending Available Cash | 1,244 | 1,310 | 2,079 | 2,417 | 2,512 | 3,419 | 3,911 |